# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARLOS MONASTERIO and BRIAN BROUILETTE, <br><br> Plaintiffs, <br><br> v. <br><br> GREYHOUND LINES, INC. a/k/a SOUTHWESTERN GREYHOUND LINES, INC.; DAVE LEACH, PRESIDENT AND CEO OF GREYHOUND LINES, INC.; BILL BLANKENSHIP, CEO IN CHARGE OF SECURITY AND SAFETY; ARNULFO BRAVO, EMPLOYEE OF SOUTHWESTERN GREYHOUND LINES, INC.; JASON VON JIMENEZ II; AND JOHN DOES I-IV <br><br> Defendants. | No. 2:15-cv-00683-PJK-SMV |

### MEMORANDUM OPINION AND ORDER
### GRANTING DEFENDANTS GREYHOUND LINE, INC.'S and ARNULFO
### BRAVO'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the court on Defendants Greyhound Lines, Inc. and Arnulfo Bravo's Motion for Summary Judgment filed December 19, 2017. ECF No. 66. Upon consideration thereof, the motion is well taken and should be granted.[1]

**Background**

This case arises out of an altercation on June 21, 2012 between Plaintiff Carlos Monasterio and Defendant Jason Von Jimenez II, which occurred on a bus operated by Defendant Greyhound Lines, Inc. ("Greyhound") and driven by Defendant Arnulfo Bravo (collectively, the "Greyhound Defendants"). Pretrial Order at 4 (ECF No. 78). At the time of the altercation, the bus was traveling from Alamogordo, New Mexico to Roswell, New Mexico on Route Schedule 450. Id.

Mr. Jimenez boarded a Greyhound bus in Fresno, California, the day prior to the altercation. Mot. for Summ. J. Memo. at 1, UDF No. 1 (ECF No. 66-7); Jimenez Dep. at 1 (p. 24) (ECF No. 66-3); Jimenez Dep. at 2 (p. 15) (ECF No. 69-2). Greyhound had a policy prohibiting weapons and conducted random searches for them. Mot. for Summ. J. Memo. at 2, UDF No. 7 (ECF No. 66-7). There is no federal regulation that requires these measures. Id.

Mr. Jimenez does not remember seeing signs at the Fresno station warning about weapons, although he is pretty sure they were there. Jimenez Dep. at 6 (p. 32) (ECF No. 69-2). Nevertheless, he carried in his backpack a pocket knife with a three-inch blade,

---

[1] This case was transferred to the undersigned in January 2019.

which he moved to his pocket while on board.  Id. at 4–5 (pp. 98, 109).  Mr. Jimenez had a general sense that he was not supposed to carry weapons on the bus, but he considered the pocket knife a tool.  Jimenez Dep. at 6 (p. 10) (ECF No. 71-1).

The bus stopped in Las Cruces, New Mexico, where Mr. Jimenez had a six-hour layover, and where he first encountered Mr. Monasterio.  Mot. for Summ. J. Memo. at 1, UDF No. 2 (ECF No. 66-7); Jimenez Dep. at 1–2 (pp. 25–29) (ECF No. 66-3).  The Las Cruces bus stop was operated by a commissioned agency and independent contractor, Shorty's Quick Mart.  Bravo Dep. at 2 (p. 112) (ECF No. 66-2); Smith Dep. at 3 (p. 131) (ECF No. 69-3).  Although Mr. Monasterio did not say anything to Mr. Jimenez, Mr. Jimenez testified that Mr. Monasterio was staring at him and "mad-dogging" him with a mean look on his face.  Jimenez Dep. at 3 (p. 30) (ECF No. 66-3).  Both Mr. Monasterio and Mr. Jimenez boarded the same bus on Route Schedule 450, which Mr. Bravo was driving.  Id. (p. 31).  Mr. Bravo had no notice that Mr. Jimenez boarded the bus with a knife, or that a fight could occur.  Mot. for Summ. J. Memo. at 2, UDF No. 4 (ECF No. 66-7); Pretrial Order at 4.  In addition, no passenger warned Mr. Bravo about Mr. Jimenez's knife or that he posed a potential threat.  Mot. for Summ. J. Memo. at 2, UDF No. 5 (ECF No. 66-7); Pretrial Order at 4.

Mr. Jimenez also testified to hearing Mr. Monasterio talk to other passengers outside the bus at a stop in Alamogordo, New Mexico, about hurting Mr. Jimenez, but they boarded after five to ten minutes without incident.  Jimenez Dep. at 4–5 (pp. 47–53) (ECF No. 66-3).  While en route, Mr. Bravo pulled the bus over to prevent it from overheating.  Bravo Dep. at 3 (pp. 127–28) (ECF No. 66-2).  Mr. Jimenez testified that

Mr. Monasterio told him that "something could just happen like right here" and suggested leaving the bus to smoke a cigarette while it was stopped. Jimenez Dep. at 13–15 (pp. 57–58, 63–34) (ECF No. 69-2). According to Mr. Jimenez, when he declined, Mr. Monasterio grabbed his arm and said, "come on." Id. at 14–15 (pp. 58, 63–64). Mr. Jimenez responded by punching Mr. Monasterio in the face. Id. at 15 (p. 64). The two men then stood up in the aisle and began punching each other while moving towards the front of the bus, at which point the bus started to move again. Id. (p. 65); Jimenez Dep. at 6 (pp. 66–68) (ECF No. 66-3). As they moved up the aisle, Mr. Jimenez pulled out his pocket knife and began stabbing Mr. Monasterio. Jimenez Dep. at 6 (p. 66) (ECF No. 66-3).

Mr. Bravo became aware of the altercation when he heard passengers say that there was a fight. Bravo Dep. at 5 (pp. 138–39) (ECF No. 66-2). He then observed in his rear-facing mirror Mr. Monasterio and Mr. Jimenez fighting and coming up the aisle, and he heard Mr. Monasterio say, "He's got a knife." Id. (p. 139). Mr. Bravo slowed the bus. Id. (p. 139). He did not see the knife, and he did not notice any blood until Mr. Jimenez and Mr. Monasterio pushed through a swinging Plexiglass gate at the front of the aisle. Id. at 5–6 (pp. 138–39, 147). Mr. Bravo then stopped the bus on the righthand side of Highway 70 and opened the main bus door. Id. at 7 (p. 156); Jimenez Dep. at 14 (pp. 58–59) (ECF No. 69-2). Mr. Jimenez and Mr. Monasterio's altercation had moved to the step well, and their fighting caused them to fall out of the opened door. Bravo Dep. at 7 (pp. 155–56) (ECF No. 66-2); Jimenez Dep. at 7 (pp. 75–76) (ECF No. 66-3). After the two men had fallen out, Mr. Bravo drove the bus approximately 300 to 400 yards, where

4

he could still see Mr. Jimenez and Mr. Monasterio, but where he believed was a "safe place to park the bus" to prevent his passengers from getting attacked. Bravo Dep. at 8 (p. 161), 10 (pp. 214–15) (ECF No. 66-2). Upon stopping, he checked on his passengers and discovered that one passenger, Brian Brouilette, had been injured after Mr. Monasterio and Mr. Jimenez fell on top of him during the altercation. Id. at 11 (p. 221); Bravo Dep. at 11–13 (pp. 161–63) (ECF No. 69-4). Mr. Bravo then exited the bus and called 911 to report the incident and that several passengers had been injured, and he called again seven minutes later when emergency responders had not yet arrived. Mot. for Summ. J. Memo. at 2, UDF No. 10; Bravo Dep. at 12 (pp. 222–24) (ECF No. 66-2); Bravo Dep. at 12–14 (pp. 162–64) (ECF No. 69-4).

The altercation ended immediately after Mr. Jimenez and Mr. Monasterio exited the bus, and Mr. Monasterio crossed to the other side of the highway to get away from Mr. Jimenez. Mot. for Summ. J. Memo. at 2, UDF No. 12 (ECF No. 66-7); Monasterio Dep. at 1 (p. 262) (ECF No. 66-6); Jimenez Dep. at 7 (p. 77) (ECF No. 66-3). Mr. Jimenez then flagged down a car and persuaded its driver to call 911 to report Mr. Monasterio's injuries. Jimenez Dep. at 8 (p. 78) (ECF No. 66-3). He then flagged down another car, which agreed to drive him to the police station. Id. (pp. 78–79). Mr. Jimenez was convicted of aggravated battery with a deadly weapon and with intent to commit a violent felony in the third degree, and he was sentenced to three years for both charges to be served consecutively. Mot. for Summ. J. Memo. at 2, UDF No. 13 (ECF No. 66-7); Jimenez Dep. at 9 (pp. 91–92) (ECF No. 66-3).

5

Mr. Monasterio and Mr. Brouilette brought their complaint in state court.² Count I alleges that two Greyhound corporate officers, Dave Leach and Bill Blankenship, were negligent and grossly negligent in failing to provide a safe environment on Greyhound buses. Count II alleges that Mr. Leach and Mr. Blankenship were grossly negligent for failing to properly train Mr. Bravo. Count III alleges that Greyhound was negligent under the doctrine of respondeat superior for the acts of Messrs. Leach, Blankenship, and Bravo. Count IV alleges that Mr. Jimenez is liable for injuries caused to Plaintiffs. Finally, Count V alleges that Defendants are jointly and severally liable for Plaintiffs' injuries.

Defendants removed this action to federal district court. Notice of Removal, Monasterio v. Greyhound Lines, Inc., 2:15-cv-00683-PJK-SMV (D.N.M. Sept. 9, 2015), ECF No. 5. This court dismissed Plaintiffs' claims without prejudice against Mr. Leach and Mr. Blankenship for lack of service. Order of Dismissal, Monasterio v. Greyhound Lines, Inc., 2:15-cv-00683-PJK-SMV (D.N.M. Aug. 30, 2016), ECF No. 22. Mr. Brouilette and the Greyhound Defendants settled. Order of Dismissal, Monasterio v. Greyhound Lines, Inc., 2:15-cv-00683-PJK-SMV (D.N.M. Jan. 1, 2018), ECF No. 70. Plaintiffs did not file an amended complaint. In light of those now party to the case, and for the purposes of deciding this motion, we read Counts I–III of the complaint to assert a negligence claim by Mr. Monasterio against the Greyhound Defendants for failing to

---

² Though the counts/theories are unnumbered, for ready reference the court will number them.

6

protect him from Mr. Jimenez, and against Mr. Bravo for failing to respond appropriately once he became aware of the altercation.[3]

**Discussion**

A party is entitled to summary judgment if it shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although the party seeking summary judgment shoulders this burden, summary judgment is proper if the non-moving party who bears the burden of proof at trial fails to demonstrate the existence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986). The court views the facts in the light most favorable to the non-moving party, but the non-moving party must come forward with specific facts suggesting a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

A defendant is liable for negligence upon a showing that (1) it had a duty to the plaintiff; (2) it breached that duty; (3) the breach proximately and in fact caused injury to the plaintiff; and (4) the plaintiff suffered damages. Herrera v. Quality Pontiac, 73 P.3d 181, 185–86 (N.M. 2003) (abrogated on other grounds by Rodriguez, 326 P.3d at 467–68). The Greyhound Defendants contest the existence of any duty owed to Mr. Monasterio on these facts, and alternatively, they contest the foreseeability of his injuries such that they did not breach any duty they owed to him. Defs.' Mot. For Summ. J. at 5–

---

[3] Mr. Monasterio abandons his claim that the Greyhound Defendants were grossly negligent and no longer seeks punitive damages. Pl's Resp. at 2, ¶ 3 (ECF No. 69).

13. They also argue that Mr. Bravo responded reasonably under the circumstances given the uncontroverted evidence. Mot. for Summ. J. Memo. at 2, ¶¶ 9–11 (ECF No. 66-7).

A.  Summary Judgment as to the Greyhound Defendant's Alleged Negligence in Failing to Prevent the Altercation

   1. Duty

As a general rule, and absent a "special relationship," New Mexico law does not impose a duty on a person to protect others from criminal acts of third persons. Ciup v. Chevron U.S.A., Inc., 928 P.2d 263, 265 (N.M. 1996). Among the special relationships that may give rise to this duty is one between "common carriers" and their passengers. Grover v. Stechel, 45 P.3d 80, 83 (N.M. Ct. App. 2002). Undoubtedly, Greyhound is a common carrier. See Dominguez v. S.W. Greyhound Lines, 155 P.2d 138, 140 (N.M. 1945) (assessing the duty of defendant Southwestern Greyhound Lines as one of a common carrier); see also Common Carrier, Black's Law Dictionary (10th ed. 2014) ("A commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee."). New Mexico imposes a duty on common carriers only to exercise ordinary care for the safety of their passengers.[4] See Defs.' Mot. For Summ. J. at 5. But such a duty does not preclude a common carrier's duty to protect against criminal, third-

---

[4] Prior to the Supreme Court of New Mexico's approval of the New Mexico Uniform Jury Instructions in 1966, the state imposed on common carriers the duty to exercise "the highest degree of care in promoting [passenger] safety." Smith v. Greyhound Lines, Inc., 382 F.2d 190, 192 (10th Cir. 1967). However, as § 13-605 of the New Mexico Civil Uniform Jury Instructions makes clear, common carriers now owe only a duty of ordinary care to their passengers. N.M.R.A., Civ. U.J.I. § 13-605 ("The defendant as a common carrier has a duty to exercise ordinary care for the safety of its passengers and their property.").

8

party actions. Indeed, the New Mexico Supreme Court has held in a different context that although a landowning business has a duty only to exercise ordinary care, such duty may include the prevention of harmful conduct from a third person on its premises. Rodriguez v. Del Sol Shopping Ctr., 326 P.3d 465, 469 (N.M. 2014); see also Grover, 45 P.3d at 83 (recognizing "possessors of land" as having a "special relationship" such that they may be required to protect another from harm). This is not to say that common carriers are insurers for their passengers against all risks created by third parties, but merely that their duty of ordinary care may include the need for them to protect their passengers against certain risks.

Both parties argue over the existence of a standalone duty to protect against a third party's criminal acts while on board a Greyhound bus. See Defs.' Mot. for Summ. J. at 5 ("Defendants had no duty to protect Plaintiff from a third party's criminal acts."); Pl's Resp. at 6 (ECF No. 69) ("[T]here is a duty to protect customers from criminal liability if their [sic] is a special relationship between the parties."). Yet Restatement (Third) of Torts, which the New Mexico Supreme Court explicitly adopted to analyze duty and breach, discourages courts from characterizing a duty in tort as a "fact-specific formulation." Restatement (Third) of Torts § 7 cmt. i (quoting Marshall v. Burger King Corp., 856 N.E.2d 1048, 1061 (Ill. 2006)); see also Rodriguez, 326 P.3d at 467. The relevant question is not whether Defendants had a duty to undertake specific actions or to protect specific individuals from criminal conduct, but whether they owed Mr. Monasterio a duty to exercise ordinary care. The existence of such a duty is clear.

9

The Greyhound Defendants also frame this court's duty inquiry as whether policy reasons counsel an expansion of what they characterize as the "limited duties" owed to their passengers. They rely upon New Mexico's Uniform Jury Instructions, including those addressing the duty to exercise ordinary care, the duty to maintain safe and suitable conditions of facilities, and the duty to provide a reasonably safe environment for passengers to alight. Defs.' Mot. for Summ. J. at 5. But under New Mexico law, the court must start by identifying an existing duty, then "articulate specific policy reasons . . . in deciding that a defendant does not have a duty or that an existing duty should be limited." Rodriguez v. Del Sol Shopping Ctr., 326 P.3d 465 (N.M. 2014). Here, Greyhound's status as a common carrier establishes the duty of ordinary care. The Greyhound Defendants have not pointed to any compelling policy reason to limit this duty of care.

  2. Breach

The existence of a duty and a "special relationship" is not sufficient to require the protection against willful, criminal actions under all circumstances. Rather, this court must assess whether the defendant acted reasonably under the particular circumstances of the case. Rodriguez, 326 P.3d at 474. This assessment bears not on the existence of a duty, but on whether that duty was breached. Id. at 471. As the severity or the likelihood of injury from third-party criminal conduct increases, so too does a defendant common carrier's burden to avoid the risk of that injury. Id. If a defendant acted reasonably and an injury is not reasonably foreseeable, a common carrier would not have breached its duty of ordinary care. Id. Thus, the issue becomes whether, on this summary judgment

record, the stabbing of one passenger by another could be viewed as reasonably foreseeable.

An occurrence is foreseeable if it comports with objective, reasonable expectations in light of the plaintiff's status and the type of harm involved. Romero v. Giant Stop-N-Go of N.M., Inc., 212 P.3d 408, 410 (N.M. 2009) (abrogated on other grounds by Rodriguez, 326 P.3d at 467–68). Simply because an occurrence is conceivably possible does not mean it is foreseeable. Id. Nor does the degree to which the particular harm to the plaintiff could have been anticipated guide this court's foreseeability analysis. Rodriguez, 326 P.3d at 468. Instead, New Mexico law requires broad consideration of the extent to which some general harm is foreseeable, id., which in turn requires consideration of acts similar to the type of crime or tort committed and a determination of whether such acts are "sufficiently commonplace." Romero, 212 P.3d at 411. The fact-intensive inquiry and the necessary weighing of evidence is often a task best suited for a jury, but occasionally a court may resolve it where no reasonable jury could find that the defendant breached the duty of ordinary care. Rodriguez, 326 P.3d at 474. In the summary judgment context, this requires a review of the summary judgment evidence.

Plaintiff contends that past events occurring on Greyhound buses demonstrate that Greyhound did not act reasonably, but those events are not sufficiently similar to what occurred in this case. Mr. Bravo testified that in the 21 years he has driven for Greyhound, he encountered a passenger with a knife approximately four or five times. Bravo Dep. at 7 (p. 86) (ECF No. 69-4). Yet in each instance, the knife was obviously visible; none of these passengers appeared violent or had violent intentions, and Mr.

11

Bravo was able to offer alternatives for eliminating the knife such as shipping it or leaving it behind.  Id. at 7–10 (pp. 86–88).  Allen Smith, a corporate director at Greyhound with responsibilities in safety and security, Smith Dep. at 2 (p. 21) (ECF No. 66-1), testified as to only one specific violent occurrence on a Greyhound bus.  That incident involved a passenger who attacked and overpowered a bus driver in Manchester, Tennessee, in October 2001 as an act of terrorism, resulting in the death of six people and the assailant.  Smith Dep. at 3 (pp. 26–27) (ECF No. 66-1).  This one violent event, occurring in a different region of the country over ten years before the altercation at issue here and differing in both degree and kind, hardly establishes the foreseeability of Mr. Jimenez's stabbing of Mr. Monasterio.[5]

Mr. Smith also testified that between October 2001 and May 2012, there was approximately one incident a year "where passengers or drivers or Ohio state troopers were attacked by Greyhound passengers with a weapon while riding on an [sic] Greyhound bus."  Smith Dep. at 8 (p. 35) (ECF No. 69-3).  However, no detail as to the type of weapons used or the nature of the attacks has been provided, nor is there sufficient context in the transcript excerpt for this court to determine whether Mr. Smith's

---

[5]  Mr. Monasterio's counsel also inquired of Mr. Smith about "the Tim McLean matter [that] occurred in Canada," which, based on the allegations in Mr. Monasterio's complaint, appears to be a reference to a violent incident between two passengers on a bus operated by the separately operated Canadian Greyhound company.  See Pls.' Compl. at 17, ¶ 50 (ECF No. 5).  However, because Mr. Monasterio fails to provide "any significant probative evidence tending to support the complaint," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), this court will not consider the "Tim McLean matter" in deciding the motion.

testimony related only to incidents in Ohio. Yet even if Mr. Monasterio had provided details of these incidents, Mr. Licata testified that Greyhound has operated approximately 10 million bus trips over the preceding 10 years, resulting in one to two attacks for every one million trips nationwide. Licata Dep. at 2 (p. 33). Accordingly, neither this court nor a reasonable jury could find that the evidence demonstrates these events were similar to the one at issue or were "sufficiently commonplace," either nationwide, in the Southwest, or along this particular bus route.

Mr. Monasterio lists a number of measures Greyhound should have taken that would have prevented Mr. Jimenez from bringing a knife on the bus, including: (1) a requirement that all purchasers of Greyhound bus tickets online acknowledge reading a list of prohibited items; (2) signage inside or outside its buses prohibiting knives; (3) a requirement that Greyhound bus drivers notify its passengers of its no-weapons policy prior to boarding;[6] and (4) more thorough weapons-screening mechanisms. Pl.'s Resp. at 3–4. As Mr. Bravo testified, he notifies his passengers of Greyhound's weapons prohibition before the trip starts, but not at intermediate stops. Bravo Dep. at 2–4 (pp. 67–69), 5–6 (pp. 99–100) (ECF No. 69-4). And, as Mr. Smith testified, Greyhound employs random magnetometer screening of passengers and their bags at major

---

[6] The parties also dispute whether Mr. Jimenez would have put his knife in his checked bag had he been told weapons were prohibited. See Pretrial Order at 5. He testified that he would have put his knife in his checked bag had the ticket agent told him that Greyhound prohibited weapons on its buses. Jimenez Dep. at 7 (p. 108) (ECF No. 69-2). However, he also testified that he had a sense that Greyhound had a policy against weapons, and that he considered his pocket knife to be a tool, not a weapon. Jimenez Dep. at 6 (ECF No. 71-1).

terminals, but that it was impracticable to screen passengers at its 2,400 stops across the United States. Smith Dep. at 8, 12. However, "no one is bound to guard against or take measures to avert that which he [or she] would not reasonably anticipate as likely to happen." Herrera, 134 N.M. at 52–53 (quoting Bogart v. Hester, 347 P.2d 327, 330 (1959)). Accordingly, the court need not address these contested matters given the failure of proof on foreseeability. Celotex, 477 U.S. at 322–23 (where a party will bear the burden of proof at trial, the failure to prove an essential element renders all other facts immaterial).

B.  Summary Judgment as to Mr. Bravo's Alleged Negligent Response to the Altercation

To the extent Mr. Monasterio claims Mr. Bravo was independently negligent in his response to the altercation, Mr. Bravo is entitled to summary judgment to this claim as well. Mr. Licata testified that, Mr. Bravo responded as he should have under industry standards by driving the bus a safe distance from Mr. Monasterio and Mr. Jimenez rather than immediately calling 911. Licata Dep. at 3 (p. 45). Although Mr. Monasterio contests this fact, he offers no evidence that creates a genuine dispute. Pl.'s Statement of Genuine Disputes at 3 (ECF No. 69-1) (citing to Plaintiffs' expert Donald Decker's Deposition at 127:24–132:4, and to Mr. Decker's Report at 10, both of which address measures Mr. Bravo purportedly should have taken prior to the altercation); see also Pretrial Order at 5 (arguing that "Bravo and Greyhound allowed the assault to continue outside the bus, and as a result, plaintiff suffered further injuries").

Mr. Montesario challenges the timing of Mr. Bravo's call to 911 and argues he created an "unnecessary delay." Pl.'s Statement of Genuine Disputes at 3. Yet, Mr. Monasterio stipulated that "Bravo immediately called for emergency assistance following the altercation." Mot. for Summ. J. Memo. at 2, UDF No. 10 (ECF No. 66-7); Pretrial Order at 4. In his response to the summary judgment motion, Mr. Montesario points to Mr. Bravo's "step-by-step description" as showing he could have called more quickly or instructed a passenger to call. Id. This is pure speculation and hardly the significantly probative evidence to preclude summary judgment. Moreover, Mr. Licata testified that, in his opinion, any slight delay in calling 911 was warranted. Licata Dep. at 3 (p. 45). In any event, the reasonableness of an emergency response, benefitting from clear hindsight, cannot turn on whether the defendant failed to undertake an array of possible actions, unaided by evidence of clear standards or protocol. Mr. Bravo is therefore entitled to summary judgment.

NOW, THEREFORE, IT IS ORDERED that:

Defendants Greyhound Lines, Inc. and Arnulfo Bravo's Motion for Summary Judgment filed December 19, 2017 (ECF No. 66) is granted.

DATED this <u>24th</u> day of January 2019, at Santa Fe, New Mexico.

/s/ Paul Kelly, Jr.
United States Circuit Judge
Sitting by Designation

Counsel:

Jeffrey W. McElroy and John Valdez, Davie, Valdez & McElroy, PC, El Paso, Texas, for Plaintiff Carlos Monasterio.

Daniel H. Hernandez, Ray, McChristian & Jeans, P.C., El Paso, Texas, for Defendants Greyhound, Inc. and Arnulfo Bravo.